UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PHILIP PULVER and CATALOGS, INC., a Washington Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>BATTELLE MEMORIAL INSTITUTE, a non-profit corporation, d/b/a/ PACIFIC NORTHWEST LABORATORY and/or PACIFIC NORTHWEST NATIONAL LABORATORY,<br><br>Defendant. | NO. CV-05-5028-RHW<br><br>**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** |

Before the Court are Defendant's five motions seeking, cumulatively, to dispose of the above-captioned case in its entirety (Ct. Recs. 163, 166, 171, 176, and 182). Also before the Court is Defendant's motion to strike (Ct. Rec. 242). A hearing on these motions was held on November 18, 2008. Plaintiff was represented by Timothy Carlson; Defendant was represented by Delbert Miller.

I. FACTS

Defendant Battelle is a non-profit corporation incorporated in Ohio that operates a number of laboratories around the United States on behalf of the Department of Energy. Battelle operates a lab in Richland called the Pacific Northwest National Laboratories (hereinafter "PNNL"), where Plaintiff Pulver worked as a Manager of Software Commercialization from 1993 to 1995. Plaintiff

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 1

was laid off in September 1995 and began working with PNNL as an independent contractor in December 1995. Plaintiff continued to work with PNNL in that capacity until the fall of 2003, when the events giving rise to this litigation came to a head.

In January 2002, Plaintiff licensed from Defendant a software product called PalmFon, which was designed to facilitate the downloading of data from a database to a portable handheld device such as a palm pilot.[1] Plaintiff paid no license fee, but agreed to "expend commercially reasonable financial resources to market, distribute, and support the SOFTWARE subject to this Agreement," and to pay Defendant a royalty of future revenue derived from PalmFon (Ct. Rec. 82-2, PalmFon Agreement, § 3A). This software developed out of an earlier product created by PNNL employees for in-house use. The PalmFon License Agreement contained certain waivers and limitations on liability, which will be discussed in detail below.

After executing the agreement and obtaining the software, Plaintiff discovered that PalmFon was not commercially viable because it was "hard-coded" for in-house use at PNNL. In addition, PalmFon lacked the capacity to transfer data from a portable handheld device back to a database, a capacity Plaintiff deemed commercially valuable. Plaintiff never generated any sales of PalmFon and abandoned the product shortly after licensing. In accordance with the terms of the License Agreement, Defendant terminated the license in 2004.

In 2002, Plaintiff worked with Defendant to develop a software product called Mobile Data Manager (hereinafter "MDM"), designed to communicate data between databases and handheld devices. The software itself was developed at

---

[1] Plaintiff Pulver signed the License Agreement on behalf of "Custom Catalogs Online, Inc.," an entity that has never existed. Plaintiff asserts that Custom Catalogs Online, Inc., is a business name of Plaintiff Catalogs Online, Inc.

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 2

PNNL by PNNL employees (led by a Senior Research Scientist named Kevin Dorow), and funded through a DOE program designed to assist small businesses. Through this program, called the Technical Assistance Program (hereinafter "TAP"), DOE grants Battelle a small amount of funding (capped at $5,000 for each contract) to work with small businesses. Plaintiff Pulver ultimately used eight separate entities to secure eight separate TAP agreements for funding. Each of these agreements related to specific portions of the overall MDM product. The programming work was performed solely by Defendant's employees, while Plaintiff Pulver contributed descriptions of the software, descriptive diagrams of its functionality, and marketing plans. Plaintiff eventually obtained copyright protection for some of the work he created during this process.

In November 2002, Plaintiff executed a License Agreement with Defendant for MDM.[2] MDM was separated into three distinct components, and through this agreement, Plaintiff secured an exclusive license for the "COLLECTIVE COMPONENTS" – i.e., the complete software product created by combination of all three components. Again, Plaintiff paid no license fee, but agreed to invest commercially reasonable funds to market MDM and to pay royalties from later revenue. Defendant Battelle and the United States of America retained a nonexclusive license to the "SOFTWARE" – i.e., any one or two of the components, but not all three. As to any data produced with Government funding (which would include all of the work performed by PNNL employees), the Government and others acting on its behalf retained a nonexclusive license to prepare derivative works and publicly display the data. Similar to the PalmFon

---

[2]Similar to the PalmFon Agreement, Plaintiff Pulver signed the MDM Agreement on behalf of "Mobile Data Methods, Inc.", an entity that has never existed. Again, Plaintiff Pulver claims Mobile Data Methods, Inc. is a business name of Plaintiff Catalogs Online, Inc.

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 3

Agreement, the MDM Agreement and the TAP Agreements contained certain waivers and limitations on liability that will be discussed below.

On August 29, 2003, Mr. Dorow delivered to Plaintiff a version of MDM. Both parties agree that there were substantial problems with this version, but they dispute the nature and extent of those problems. Plaintiff claims that the version was completely unworkable and in fact lacked the functionality of earlier versions of MDM, as well as functionality that Defendant had represented MDM to have. Plaintiff declares that in a telephone conversation on September 10, 2003, Mr. Dorow admitted that the 08/29/2003 version was an "embarrassment," but that Defendant was in possession of a working version. Plaintiff further claims that Mr. Dorow stated he would provide Plaintiff with the working version only if Plaintiff paid Defendant $25,000 in a private consulting contract.

Mr. Dorow acknowledges that the 08/29/2003 version was not finished or fully tested, but claims that it was the state of MDM at the time the TAP funding ran out. Mr. Dorow claims that Plaintiff Pulver was fully aware of the state of the software, but as funding was running out he consistently asked Mr. Dorow to add functionality to the software rather than test it. Mr. Dorow describes Plaintiff's version of the September 10, 2003, conversation as a "gross mischaracterization." Mr. Dorow recalls telling Plaintiff that no additional government funds were available, and that in order to continue working on MDM, Defendant Battelle would require a minimum private contract of $25,000. Mr. Dorow states that, "I gave [Plaintiff] the best work I could and then some" (Ct. Rec. 240, Reply Declaration of Kevin Dorow, p. 3, ln. 5-6). Mr. Dorow's position is supported by an e-mail he sent to Defendant's Manager of Economic Development on September 2, 2003 (attached to Dorow's Declaration).

After these events, Plaintiff Pulver filed a complaint with the DOE, claiming that Mr. Dorow had misrepresented the progress of MDM development in reports he had provided to the DOE. This action effectively brought to an end the working

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 4

relationship between the parties. By June 2004, Defendant and its agents had stopped forwarding any consulting work orders to Plaintiff, and Defendant ceased accepting communications from Plaintiff.

Since its falling out with Plaintiff, Defendant has continued to develop software designed to communicate data between databases and handheld devices. That software, known variously by the acronyms PDAC and RDADS, has been the subject of numerous discovery orders previously issued by the Court (see discussion, *infra*). The parties do not dispute that neither Defendant nor any other party has commercialized any version of the software.

## II.  STANDARD OF REVIEW

Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to (2) any material fact and that (3) the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "material fact" is determined by the substantive law regarding the legal elements of a claim. *Id.* at 248. If a fact will affect the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth, then it is material. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby,* 477 U.S. at 248.

The moving party has the burden of showing the absence of a genuine issue as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). In accord with Rules of Civil Procedure  56(e), a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 5

of his pleading, but... must set forth specific facts showing that there is a genuine issue for trial." *Id.* Summary judgment is appropriate only when the facts are fully developed and the issues clearly presented. *Anderson v. American Auto. Ass'n*, 454 F.2d 1240, 1242 (9th Cir. 1972). "Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

#### A. *Defendant's Motion to Strike*

In response to Defendant's motions, Plaintiff has filed (by Defendant's count) more than 1,300 pages of documents, including eight separate declarations. In essence, Defendant asks the Court to strike all but a few paragraphs of one declaration, arguing that the remaining declarations do not meet the standards of Rule 56 because they present "accumulations of irrelevant, inadmissible and improper materials thrown indiscriminately at the Court" (Ct. Rec. 248, Defendant's Reply Memorandum). Defendant goes on to argue, "Plaintiffs have largely disregarded the Federal and Local Court rules designed to prevent the tsunami of paper that has hit the shores of this Court" (*Id.*).

Plaintiff responds that Defendant has failed to specifically identify which statements in the declarations should be stricken. Plaintiff also cites case law establishing that motions to strike are disfavored, especially in complex cases, and that courts treat papers supporting the memoranda of nonmoving parties with particular indulgence. *See Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991); *Lazar v. Trans Union, L.L.C.*, 195 F.R.D. 665, 669 (C.D. Cal. 2000); *Wailua Assoc. v. Aetna Cas. and Sur. Co.*, 183 F.R.D. 550, 553-54 (D. Hawaii 1998).

There can be no question that large portions of Plaintiff Pulver's

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 6

declarations, in particular, constitute legal argument and conclusions that are inappropriate and would be inadmissible. In addition, Plaintiff has overwhelmed the Court with hundreds of pages of filings that are indecipherable, confusing, and largely irrelevant. However, woven into other portions of Plaintiff's proffered declarations are factual allegations that the Court finds relevant and material. Therefore, rather than exercise its discretion to strike, the Court will simply give weight only to the relevant portions of Plaintiff's filings discussed below. Accordingly, Defendant's motion to strike is denied.

*B. Defendant's Motion to Dismiss Plaintiff's Claim for Tortious Interference with an Ongoing Contract (Cause of Action 12)*

Defendant moves to dismiss Plaintiff's twelfth cause of action under Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim upon which relief can be granted. Essentially, Defendant argues that Plaintiff has only alleged that Defendant interfered with a contract between Plaintiff and Defendant (*viz.*, Plaintiff's independent consulting contracts with Defendant), and that the actions of Defendant and Defendant's agents destroyed Plaintiff's subcontracting business. Because a party cannot interfere with its own contract, Defendant asks the Court to dismiss this claim as a matter of law.

Plaintiff appears to concede that the allegations in the Fourth Amended Complaint do not support the twelfth cause of action; however, Plaintiff argues that Defendant's efforts to market MDM in the private sector "destroyed Plaintiffs' contractual interests with persons other than Defendants" and thus constituted "tortuous interference" [sic] (Ct. Rec. 210, Plaintiff's Memorandum in Opposition).

As pleaded, Plaintiff's twelfth cause of action alleges only that Defendant failed to enter into new contracts with Plaintiff. Those allegations cannot establish "the existence of a valid contractual relationship," necessary to make out a claim for tortious interference. *See Commodore v. University Mechanical Contractors,*

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** \* 7

*Inc.*, 120 Wash. 2d 120, 137 (1992). Therefore, Plaintiff fails to state a claim for which relief can be granted and Defendant's motion to dismiss is granted.

*C. Defendant's Motion for Partial Summary Judgment Dismissing SYNTH Claims*
*(Causes of Action 14-18)*

Because Plaintiff filed a statement agreeing to the dismissal of these causes of action (Ct. Rec. 214), this motion is denied as moot.

*D. Defendant's Motion for Summary Judgment Dismissing PalmFon Claims*
*(Causes of Action 1-5 & 13)*

As a threshold matter, Defendant argues that the Court should dismiss these claims (as well as all other claims surrounding the license agreements) because Plaintiff is not the real party in interest. Defendant argues that because Plaintiff signed the license agreements on behalf of nonexistent entities, Plaintiff cannot purport now to represent those entities' interests. Plaintiff responds by citing the general rule of law that, "absent unfair prejudice, an individual purporting to act as a corporation is a party to a contract signed in the name of the nonexistent corporation." *White v. Dvorak*, 78 Wash. App. 105, 107-08 (1995). Both parties acknowledge there is a paucity of authority on this precise issue.

No prejudice appears from the record. At all relevant points, all parties have accepted and proceeded on the premise that Plaintiff Pulver is the real party in interest. Plaintiff's signature appears on all relevant documents, Plaintiff personally conducted all dealings with Defendant, and (with the exception of this new argument) the parties have always accepted that Plaintiff actually held the licenses in question. Accordingly, Defendant's threshold argument lacks merit.

Plaintiff alleges the following causes of action with respect to Defendant's conduct surrounding the PalmFon license agreement: (1) misrepresentation; (2) conspiracy to make those misrepresentations; (3) unfair competition and unfair business practices; (4) interference with business expectancy; (5) breach of fiduciary duty; and (13) breach of contract (this cause of action also alleges breach

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** \* 8

of contract with respect to the MDM Agreement).

Plaintiff argues that he entered the PalmFon Agreement in reliance on certain of Defendant's representations involving the software, including Defendant's promotional descriptions of the software as "designed to integrate to any relational database," and able to "tie[] into ANY standard relational database (Ct. Rec. 82, Fourth Amended Complaint, ¶¶ 4-6, 8). Plaintiff acknowledges that he observed a demonstration of the software at PNNL, but argues that he was unable to "independently" evaluate PalmFon until after he executed the license agreement. Plaintiff argues that his subsequent discovery that PalmFon was "hard-coded" for use only within PNNL gives rise to the causes of action related above.

Defendant moves the Court to dismiss those claims, citing the following relevant provisions of the agreement:

> ¶ 2B. ...As to data produced with Government funding, the Government is granted for itself and others acting on its behalf a nonexclusive, paid-up, irrevocable worldwide license in this data to reproduce, prepare derivative works, and perform publicly and display publicly, by or on behalf of the Government... NEITHER THE UNITED STATES NOR THE UNITED STATES DEPARTMENT OF ENERGY, NOR ANY OF THEIR EMPLOYEES, MAKES ANY WARRANTY, EXPRESS OR IMPLIED OR ASSUMES ANY LEGAL LIABILITY OR RESPONSIBILITY FOR THE ACCURACY, COMPLETENESS OR USEFULNESS OF ANY DATA, APPARATUS, PRODUCT, OR PROCESS DISCLOSED, OR REPRESENTS THAT ITS USE WOULD NOT INFRINGE PRIVATELY OWNED RIGHTS. (emphasis in original)
> ...
> ¶ 9B. **LICENSEE RECOGNIZES THAT THE SOFTWARE IS PROVIDED BY BMI ON AN AS-IS BASIS. NEITHER THE U.S. GOVERNMENT NOR BMI NOR ANY AFFILIATED COMPANY OF BMI SHALL HAVE ANY LIABILITY WHATSOEVER TO LICENSEE OR ANY OTHER PERSON INCLUDING CUSTOMERS OF LICENSEE FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE, OF ANY KIND OR NATURE SUSTAINED BY, OR ANY DAMAGE ASSESSED OR ASSERTED AGAINST, OR ANY OTHER LIABILITY INCURRED BY OR IMPOSED UPON LICENSEE OR ANY OTHER PERSON, ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM (i) THE PRODUCTION, USE OR SALE OF THE LICENSED SOFTWARE OR ANY APPARATUS, PRODUCT, OR PROCESS; (ii) THE USE OF ANY TECHNICAL INFORMATION, TECHNIQUES, OR PRACTICES DISCLOSED BY BMI; OR (iii) ANY ADVERTISING OR**

**OTHER PROMOTIONAL ACTIVITIES WITH RESPECT TO ANY OF THE FOREGOING, AND LICENSEE SHALL HOLD THE U.S. GOVERNMENT, BMI, AND ANY AFFILIATED COMPANY OF BMI, HARMLESS IN THE EVENT THE U.S. GOVERNMENT, BMI, OR ANY AFFILIATED COMPANY OF BMI, IS HELD LIABLE**. (emphasis in original).

...

¶ 9F. LICENSEE has tested and evaluated the SOFTWARE. The signing of this Agreement constitutes acceptance by LICENSEE of the SOFTWARE as provided and without change.

...

¶ 21. This Agreement represents the entire understanding between the parties, and supersedes all other agreements, express or implied, between the parties concerning the SOFTWARE. This Agreement shall not be modified except in writing, signed by both parties.

Defendant argues that Plaintiff's claims 1-5 & 13 cannot, as a matter of law, survive these limitations of liability. Defendant points to Washington cases holding that such contractual limitations are presumed valid and conscionable in commercial transactions, and are especially favored in commercial transactions dealing with software licensing. *See Schroeder v. Fageol Motors, Inc.*, 86 Wash. 2d 256, 262-63 (1975) (holding that "exclusionary clauses in purely commercial transactions are prima facie conscionable," and shifting the burden to the party claiming unconscionability); *Mortensen Co. v. Timberline Software*, 140 Wash. 2d 568, 586-590 (1999) (finding a limitation on consequential damages in a software's shrink-wrap packaging neither substantively nor procedurally unconscionable).

Plaintiff asserts two arguments in opposition to summary judgment: (1) the limitations as written do not shield Defendant from liability; and (2) the limitations are unconscionable. Plaintiff argues that the warranty disclaimer in ¶2B does not help Defendant because it is limited to the United States and DOE. Plaintiff also argues that the limitation of liability in ¶9B "was clearly meant to limit Battelle's potential liability to third party buyers of the product" and thus does not help Defendant escape Plaintiff's claims of breach of contract and "tortuous conduct" [sic]. Alternatively, Plaintiff argues that the limitations are unconscionable because

they are "onerous," "one-sided," and would deprive Plaintiff of the substantive value of its bargain. Plaintiff argues that, under Defendant's interpretation of these provisions, Plaintiff would never have any legal remedy even for breach of contract.

While Battelle may not receive any protection from the specific warranty disclaimer in ¶2B, the other provisions of the agreement are unambiguous and, the Court finds, preclude precisely the kinds of claims now advanced by Plaintiff. Defendant is correct that under Washington law these provisions are presumed to be effective and conscionable, and Plaintiff has simply failed to rebut that presumption. The undisputed facts establish that Plaintiff was a sophisticated commercial actor who had become familiar with these kinds of license agreements during his tenure as Defendant's Manager of Software Commercialization. The undisputed facts show that he received exactly what he bargained for, *viz.*: a free, nonexclusive license to develop and market PalmFon as it existed at the time of licensing (no matter how it had been represented in Defendant's promotional materials). The fact that he was never able to realize profits from that license does not establish that Defendant breached the agreement or is otherwise liable to Plaintiff.

Therefore, this motion is granted.

*E. Defendant's Motion for Partial Summary Judgment Dismissing MDM Claims (Causes of Action 6-11, 13)*

Plaintiff alleges the following causes of action with respect to Defendant's conduct surrounding the MDM license agreement: (6) misappropriation of trade secrets; (7) misrepresentation; (8) conspiracy to make misrepresentations; (9) unfair competition and unfair business practices; (10) interference with business expectancy; (11) breach of fiduciary duty; and (13) breach of contract.

With regard to claim 6, Plaintiff has simply failed to even identify what trade secrets existed and what conduct of Defendants constituted misappropriation.

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 11

Plaintiff's briefing on the subject states:

> Plaintiffs have outlined elsewhere in this brief and in the factual statements multiple trade secrets that were given to Defendant under confidentiality provisions and without transfer of intellectual property rights to defendant. These included not only marketing plans, but also direct computer coating and software architectural design plans described in the declarations of Philip Pulver.

Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment Dismissing MDM Claims (Ct. Rec. 217, p. 25 ln 20-28). Plaintiff apparently asks the Court to comb through the reams of paper Plaintiff has submitted to determine whether this claim can survive summary judgment. However, Plaintiff acknowledges that, "A plaintiff seeking damages for the misappropriation of a trade secret has the burden of proving that a legally protectable trade secret exists" (Ct. Rec. 217, p. 25 ln 2-5). The Court finds that Plaintiff has failed to proffer any evidence that would create a genuine issue of material fact with respect to the existence of trade secrets, and thus this claim must fail as a matter of law.

Because the MDM License Agreement contains the same warranty disclaimer and liability limitation language quoted above, the parties reiterate their arguments advanced with respect to the PalmFon Agreement. As set forth in the Court's analysis, *supra*, Plaintiff's causes of action 7 and 8 must fail because of this valid limitation language.

With respect to cause of action 11, Plaintiff has failed to allege any facts that would support the existence of a fiduciary duty for Defendant. Plaintiff has not briefed this issue, but instead advances arguments and facts that support his breach of contract claim. The Court finds nothing in the record suggesting that Defendant assumed some position of trust that would give rise to a fiduciary duty. This appears to be simply a commercial transaction between two sophisticated parties. Thus, summary judgment on this claim is appropriate.

Plaintiff's breach of contract claim here differs from his claim for breach of the PalmFon Agreement because the MDM Agreement also incorporates by

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 12

reference a number of TAP agreements. Although some of these agreements are signed by individuals other than Plaintiff Pulver, the parties agree that all the TAP agreements relate to development of portions of MDM. All of the agreements contain the following provisions:

> ¶1. Battelle Memorial Institute (BATTELLE) agrees that all information obtained by BATTELLE through the work described herein shall be made available to the REQUESTER at any reasonable time during BATTELLE's working hours subject to the terms and conditions of this Agreement, and that BATTELLE will communicate to the REQUESTER information developed under and pertinent to this technical investigation.
> ...
> ¶3. In view of the research and developmental nature of the work hereunder, BATTELLE's responsibility shall be limited to applying its best efforts in the performance of the work by competent staff within the limits of time and funds available.
>
> ¶4. **Neither BATTELLE, the U.S. Department of Energy (DOE), nor persons acting on their behalf, make any warranty, express or implied: (a) with respect to the merchantability, fitness for a particular purpose, accuracy, completeness, or usefulness of any services, materials, or information furnished; (b) that the use of any such services, materials, or information may not infringe privately owned rights; or (c) that the services, materials, or information furnished will be adequate or safe for any purpose or will accomplish the intended results or purpose. Furthermore, BATTELLE and the DOE hereby specifically disclaim any and all warranties, express or implied, for any products manufactured, used or sold by the REQUESTER. Neither BATTELLE nor the DOE shall be liable for consequential damages in any event. Furthermore, the REQUESTER will indemnify and hold harmless BATTELLE and the DOE from any loss by the REQUESTER or third parties arising out of or resulting from utilization of any such information, apparatus, method or process.**
> (emphasis in original)

There are two significant differences from the Court's analysis under the PalmFon Agreement, *supra*: (1) Plaintiff argues that Defendant breached the license agreement by developing and displaying derivative works to which Plaintiff held an exclusive license; and (2) Plaintiff argues that Defendant breached the TAP agreements by failing to make available all information regarding MDM, and failing to provide its best efforts.

Plaintiff's first argument regarding derivative works is foreclosed by the

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 13

Court's prior orders regarding discovery, which are now the law of the case. The Court's most recent order stated: "Reading the MDM Agreement as a whole, the Court finds Defendant has the right to create, reproduce, and use "Derivative Works" of the "Software" and of the "Collective Components" (Ct. Rec. 209). This finding renders moot a great deal of Plaintiff's argument and supporting documentation, and dictates that the Court grant summary judgment on causes of action 9 (for unfair competition and unfair business practices) and 10 (for interference with business expectancy).

Plaintiff's second argument deserves closer inspection. Defendant's contractual obligations here differ from its obligations under the PalmFon Agreement, and require an examination of the MDM Agreement as modified by the TAP Agreements. Defendant argues that, according to the limitation language in both agreements, Defendant was not obligated to produce *any* workable product at all. Under Defendant's theory, Plaintiff was not contractually entitled to expect to receive any useful version of MDM because Plaintiff had expressly accepted the product "as is."

Defendant is correct that the MDM Agreement expressly disclaims any promise to deliver a workable end product. However, construing the contract as a whole, including the TAP Agreements, the Court finds that Defendant promised to exert its best efforts to develop MDM and to turn over to Plaintiff the results of those best efforts – workable or not. As consideration for this promise, Defendant received Plaintiff's reciprocal promise to invest commercially reasonable funds to market MDM and to pay Defendant royalty fees from later revenue.

Plaintiff has proffered evidence that, if believed by a jury, could support a finding that Defendant breached this contract. As discussed above, the parties dispute a number of facts surrounding the delivery of a version of MDM to Plaintiff on 08/29/2003. Plaintiff claims that the version was inferior to a workable version Defendant previously demonstrated for him. Plaintiff also claims that Mr.

1  Dorow intentionally withheld the workable version and essentially attempted to
2  extort money from Plaintiff for its delivery. Defendant agrees that the 08/29/2003
3  version needed work but asserts that it was in fact the only version in existence.
4  Defendant also denies Plaintiff's characterization of the conversation with Mr.
5  Dorow. Resolving this factual dispute requires a determination of credibility and,
6  therefore, summary judgment is inappropriate.

*F. Defendant's Motion for Partial Summary Judgment Dismissing Copyright Claim (Cause of Action 19)*

Plaintiff secured a copyright for certain works he created during the process of developing MDM, and alleges that Defendant subsequently copied those works. Defendant does not dispute copying, but advances a number of jurisdictional arguments and argues: (1) that the copyright is invalid; (2) even if the copyright is valid, the copyrighted material was co-authored by Mr. Dorow; and (3) Plaintiff has proffered insufficient evidence on the issue of damages.

"To establish a successful claim for copyright infringement, the plaintiff must prove (1) ownership of the copyright, and (2) 'copying' of protectible expression by the defendant." *Baxter v. MCA, Inc.,* 812 F.2d 421, 423 (9th Cir. 1987). All authors of a "joint work" are co-owners of a copyrighted work, and enjoy all the benefits of ownership. 17 U.S.C. § 201(a); *Richlin v. MGM Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008), *cert denied*, — S. Ct. —, 2009 WL 129117 (2009).[3]

Plaintiff argues that the question of joint authorship is clearly reserved for a jury, citing the Ninth Circuit Manual of Model Civil Jury Instructions, § 17.7, Copyright Interests – Joint Authors. The comment to this instruction merely states

---

[3] A "joint work" is defined as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** \* 15

that joint authorship "is *often* a question of fact for the jury to determine" (emphasis added), and cites as illustration of this point *Goodman v. Lee*, 988 F.2d 619, 625 (5th Cir. 1993). A cursory examination of Ninth Circuit cases establishes that the question of joint authorship is not exclusively reserved for the jury. *See, e.g., Richlin*, 531 F.3d at 967-970 (upholding a district court's grant of summary judgment on the issue of joint authorship); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1236 (9th Cir. 2000) (same); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989) (reversing a district court's grant of summary judgment on the issue of joint authorship). Like any question of fact, joint authorship may be resolved as a matter of law if there is no genuine dispute about the material facts.

The Ninth Circuit has adopted three criteria for determining the joint authorship question. *Richlin*, 531 F.3d at 968. First, the Court must examine "whether the putative coauthors made objective manifestations of a shared intent to be coauthors"; second, "whether the alleged author superintended the work by exercising control"; and third, "whether the audience appeal of the work can be attributed to both authors, and whether the share of each in its success cannot be appraised." *Id.* (quoting *Aalmuhammed*, 202 F.3d at 1234).

Defendant has provided a series of email exchanges between Mr. Dorow and Plaintiff, ranging from July 17, 2002, to May 21, 2003, regarding the MDM descriptive materials (Ct. Rec. 240, Reply Declaration of Kevin Dorow, Ex. 2-6). These emails establish that the work now subject to Plaintiff's copyright was in fact the result of a collaborative effort between Plaintiff and Mr. Dorow. While Plaintiff created an initial draft of the work, Plaintiff repeatedly requested and received input from Mr. Dorow. Substantial language written solely by Mr. Dorow now appears in the text describing the MDM product. Moreover, one of the two pictorial diagrams in the work was created solely by Mr. Dorow and included in the copyrighted work without change (Ct. Rec. 240, Reply Declaration of Kevin Dorow, Ex. 3, p. 2 of 7). These exchanges constitute "objective manifestations of a

shared intent to be coauthors," and demonstrate that Mr. Dorow exercised a significant amount of control over the copyrighted work, satisfying *Richlin*'s first and second criteria for joint authorship. 531 F.3d at 968. The third criterium, audience appeal, is impossible to apply given the uncontested fact that MDM has never been commercialized.

Given these uncontested facts, no reasonable jury could conclude that Mr. Dorow did not make "an independently copyrightable contribution" to the work. *See Richlin*, 531 F.3d at 968 (quoting *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990). No matter how minor his contribution as a joint author, Mr. Dorow (an agent of Defendant) is entitled to "all benefits of joint authorship" – including copying. *See id.* Accordingly, Defendant is entitled to summary judgment on Plaintiff's copyright clam.

## IV. CONCLUSION

Defendant's motion to strike is denied. Defendant's motion to dismiss Plaintiff's claim for tortious interference is granted. Defendant's motion for summary judgment on Plaintiff's SYNTH claims is denied as moot. Defendant's motion for summary judgment on Plaintiff's PalmFon claims is granted. Defendant's motion for summary judgment on Plaintiff's MDM claims is granted except with respect to Plaintiff's cause of action 13, for breach of the MDM License Agreement (and incorporated TAP Agreements) only. Defendant's motion for summary judgment on Plaintiff's copyright claim is granted.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion to Dismiss Claims for Tortious Interference with an Ongoing Contract (Ct. Rec. 163) is **GRANTED.**

2. Defendant's Motion for Partial Summary Judgment Dismissing SYNTH Claims (Causes of Action 14-18) (Ct. Rec. 166) is **DENIED as moot.**

3. Defendant's Motion for Partial Summary Judgment Dismissing PalmFon Claims (Causes of Action 1-5 and 13) (Ct. Rec. 171) is **GRANTED.**

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** \* 17

  4. Defendant's Motion for Partial Summary Judgment Dismissing MDM Claims (Causes of Action 7-11 and 13) (Ct. Rec. 176) is **GRANTED in part and DENIED in part.**

  5. Defendant's Motion for Partial Summary Judgment Dismissing Copyright Infringement Claim Cause of Action 19 (Ct. Rec. 182) is **GRANTED.**

  6. Plaintiff's Motion to Continue (Ct. Rec. 204) is **GRANTED.**

  7. Defendant's Motion to Strike (Ct. Rec. 242) is **DENIED.**

  **IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies to counsel.

  **DATED** this 29th day of January, 2009.

*S/ Robert H. Whaley*

ROBERT H. WHALEY  
Chief United States District Judge

Q:\CIVIL\2005\Pulver\grant.SJinpart.ord.wpd

**ORDER GRANTING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** * 18